FILED
2024 Apr-12  AM 11:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **ETHAN POWELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. 6:22-cv-01585-MHH** |
| | } | |
| **MARTIN O' MALLEY,** | } | |
| **COMMISSIONER OF** | } | |
| **SOCIAL SECURITY,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Ethan Powell has asked the Court to review a final adverse decision of the Commissioner of Social Security. The Commissioner denied Mr. Powell's claim for a period of disability and disability insurance benefits and his claim for adult child's insurance benefits based on an Administrative Law Judge's finding that Mr. Powell was not disabled.[2] Mr. Powell argues that, because he received child disability

---

[1] On December 20, 2023, Martin O'Malley was sworn in as Commissioner of the Social Security Administration. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Commissioner O'Malley as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds officer, the "court may order substitution at any time. . . .").

[2] To be eligible for disability insurance benefits under title II, Mr. Powell must show that he became disabled before the expiration of his disability insured status on June 30, 2020. *See* 42 U.S.C. §§ 416(i)(3), 423(a), (c); 20 C.F.R. §§ 404.101, 404.130, 404.131(b)); (Doc. 9-3, p. 14; Doc. 9-7, p. 12).

benefits that terminated when he turned 19 years old, the Administrative Law Judge—the ALJ—should have applied the medical improvement standard to evaluate Mr. Powell's new applications.[3]   Mr. Powell also argues that substantial evidence does not support the ALJ's pain standard findings regarding the effects of his mental limitations.   After careful consideration of the administrative record, for the reasons explained below, the Court affirms the Commissioner's decision.

## ADMINISTRATIVE PROCEEDINGS

To succeed in his administrative proceedings, Mr. Powell had to prove that he was disabled.  *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013).  "A claimant is disabled if he is unable to engage in substantial gainful activity

---

For adult child's insurance benefits, an "adult who has a disability that began before age 22 may be eligible for benefits if their parent is deceased or starts receiving retirement or disability benefits.  We consider this a 'child's' benefit because it is paid on a parent's Social Security earnings record.  The Disabled Adult Child (DAC) . . . must be unmarried, age 18 or older, have a qualified disability that started before age 22, and meet the definition of disability for adults." https://www.ssa.gov/benefits/disability/qualify.html (last visited February 27, 2024); s*ee* 42 U.S.C. § 402(d)(1); 20 C.F.R. §§ 404.350, 404.1505(a).

[3]  On October 28, 2010, when Mr. Powell was 14 years old, an ALJ issued a favorable decision, and Mr. Powell began receiving supplemental security income for a mental disability that began on March 27, 2009.  (Doc. 9-4, pp. 6-11).  The ALJ found that Mr. Powell had marked limitations in acquiring and using information and in attending and completing tasks; no limitation in moving about and manipulating objects; and "less than a marked limitation" in interacting and relating to others, caring for personal needs, and "health and physical well-being."  (Doc. 9-4, p. 9).  Mr. Powell's child disability benefits terminated when he turned 19 years old; the administrative record for this case does not indicate the reason for the termination.  (Doc. 9-3, p. 73).  Mr. Powell's mother testified that the administration "cut [Mr. Powell] off when he just turned 19."  (Doc. 9-3, p. 73).  Ms. Powell testified that they did not appeal the decision and allowed her son's child disability benefits to end because Mr. Powell "wanted it to end because he was going to try and work."  (Doc. 9-3, p. 73).

by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months."  42 U.S.C. § 423(d)(1)(A).[4]

To determine if a claimant is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); *see* 20 C.F.R. § 416.920.  "The claimant has the burden of proof with respect to the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the

---

[4] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program.  Title XVI of the Act governs applications for Supplemental Security Income or SSI.  "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited February 22, 2024).  The definition for disability also is the same for adult child's insurance benefits. https://www.ssa.gov/benefits/disability/qualify.html (last visited February 27, 2024).

claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Mr. Powell applied for a period of disability and disability insurance benefits on June 1, 2020 and for adult child's insurance benefits on June 2, 2020. (Doc. 9-6, pp. 2, 9). In both applications, Mr. Powell initially alleged that his disability began on March 27, 2009, (Doc. 9-4, pp. 55, 75), but later amended the alleged onset date to January 2, 2019, (Doc. 9-6, p. 26).[5] The Social Security Commissioner initially denied Mr. Powell's claims, and Mr. Powell requested a hearing before an Administrative Law Judge. (Doc. 9-5, p. 31). Mr. Powell and his attorney attended a telephone hearing with an ALJ on December 1, 2021. (Doc. 9-3, pp. 45-77). Mr. Powell's mother, grandfather, and a vocational expert testified at the hearing. (Doc. 9-3, pp. 63, 66, 74).

The ALJ issued an unfavorable decision on December 27, 2021. (Doc. 9-3, pp. 11-23). On July 6, 2022, the Appeals Council denied Mr. Powell's request for

---

[5] Mr. Powell was born on January 10, 1996, (Doc. 9-7, p. 72), and would have been 22 years old on January 2, 2019, the date of his amended alleged disability onset date. The ALJ stated that because Mr. Powell "did not specifically move to dismiss the claim for child's insurance benefits," the ALJ adjudicated both his title II disability insurance and adult child's insurance claims. (Doc. 9-3, p. 11). The ALJ did so on the merits. Because the Court will affirm the ALJ's decision, the Court will not explore the procedural implications of the amended onset date for Mr. Powell's claim for childhood disability insurance benefits. *See* 42 U.S.C. § 402(d)(1); 20 C.F.R. §§ 404.350, 404.1505(a).

review, (Doc. 9-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review, 42 U.S.C. § 405(g).[6]

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Mr. Powell's Childhood Disability Finding*

In 2010, when Mr. Powell was 14 years old, an ALJ found that Mr. Powell had the severe mental impairments of ADHD, personality disorder, ODD, mood disorder, "rule out bipolar disorder," and learning disorder.  (Doc. 9-4, p. 9). Because his severe limitations caused Mr. Powell to have marked limitations in his ability to acquire and use information and in his ability to attend to and complete tasks, the ALJ found that Mr. Powell was disabled under the Social Security Act beginning March 27, 2009 and awarded him supplemental security income benefits. (Doc. 9-4, pp. 9, 11).

### *Mr. Powell's Medical Records*

To support his 2020 application for disability insurance benefits and for adult child's insurance benefits, Mr. Powell submitted medical records relating to treatment and diagnoses of several medical conditions including Asperger's syndrome, oppositional defiant disorder (ODD), attention deficit-hyperactivity

---

[6]  Mr. Powell requested from the Appeals Council an extension of time to file an appeal in the district court.  (Doc. 9-3, p. 29).  On December 13, 2022, the Appeals Council notified Mr. Powell that he could file a civil action in federal district court within 30 days of receipt of the notice. (Doc. 9-3, p. 29).  Mr. Powell filed his appeal in federal district court on December 20, 2022, within the 30-day deadline, making his appeal timely.  (Doc. 1).

disorder (ADHD), mood disorder, social anxiety disorder, and bipolar disorder. The Court has reviewed Mr. Powell's complete medical history and summarizes the following medical records because they are most relevant to Mr. Powell's arguments in this appeal.

On October 5, 2012, when Mr. Powell was 16 years old and in the tenth grade, he was admitted for 10 days to the Adolescent Unit at Hillcrest Behavioral Health Services. He was suicidal and had threatened to hang himself with a wire. (Doc. 9-8, p. 5). His admitting diagnoses included ADHD, ODD, and bipolar without depression, and his GAF score was 35. (Doc. 9-8, p. 5).[7] Mr. Powell reported that he had auditory hallucinations and had graphic sexual dreams about an unknown woman. (Doc. 9-8, p. 5). Dr. Shakil Khan noted that Mr. Powell was anxious and nervous, had mood swings, heard good and bad voices that told him to do things, and had limited insight and judgment. (Doc. 9-8, p. 6). Dr. Khan indicated that Mr. Powell had gradual improvement in his thought processes and interactions with his peers during treatment but reported that Mr. Powell talked to an "imaginary friend." (Doc. 9-8, p. 7). Dr. Kahn prescribed Geodon for Mr. Powell's psychosis,

_____

[7] "The GAF is a numeric scale intended to rate the psychological, social, and occupational functioning of adults." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1253 (11th Cir. 2019) (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32, 34 (4th ed. 2000)). Scores under 50 indicate severe difficulty in mental functioning, scores between 51 and 60 indicate moderate difficulty, and scores between 61 and 70 indicate mild difficulty. *See* https://www.lb7.uscourts.gov/documents/17-04172.pdf (last visited February 22, 2024).

Wellbutrin for mood, Clonidine for ADHD, and Cogentin for "EPS."  (Doc. 9-8, p. 7).[8]

In June 2015, at age 19, Mr. Powell saw social worker Quatita Harton and certified nurse practitioner Sarah Gilreath at Northwest Alabama Mental Health Center.  (Doc. 9-8, p. 29).[9]  Mr. Powell's diagnoses included ODD, ADHD, mood disorder, rule out bipolar disorder, and rule out personality disorder.  (Doc. 9-8, p. 29).  Mr. Powell reported that his medications were working well, and he had no medication side effects.  (Doc. 9-8, p. 30).  He stated that he did not have behavioral concerns; "overarching depression, anxiety, irritability, or lability;" suicidal ideations or hallucinations; or sleep problems.  (Doc. 9-8, p. 30).  Mr. Powell had graduated from high school and reported that he had "no definite plans for the future."  He stated that he "considered going to college but [was not] sure if [college would] work out as people irritate[d] him."  (Doc. 9-8, p. 30).  Mr. Powell had a cooperative attitude and happy mood, appropriate speech, fair judgment, impaired and limited insight, appropriate attention and concentration, congruent affect, unremarkable thought content, concrete thought processes, alert cognition,

---

[8] "Extrapyramidal side effects (EPS), commonly referred to as drug-induced movement disorders, are among the most common adverse drug effects patients experience from dopamine-receptor blocking agents."  *See* https://www.ncbi.nlm.nih.gov/books/NBK534115/ (last visited February 22, 2024).

[9] The June 2015 record indicates that Mr. Powell visited Northwest Alabama Mental Health Clinic on March 10, 2015.  (Doc. 9-8, p. 29).  The Court has not found a record from the March visit in the administrative record.

appropriate recent and remote memory, a full range of knowledge, and average "intelligence impression." (Doc. 9-8, p. 31). CRNP Gilreath continued Mr. Powell on Adderall, Geodon, Clonidine, and Cogentin; recommended continued therapy; and noted that Mr. Powell would transition to adult services because he had graduated high school. (Doc. 9-8, p. 32).

In September 2015, Mr. Powell transitioned to adult services at Northwest Alabama Mental Health Center and saw psychiatrist Dr. Clyde McLane. (Doc. 9-8, pp. 34-35). Mr. Powell reported that he lost his disability and Medicaid when he turned 19. (Doc. 9-8, p. 35). Dr. McLane noted that Mr. Powell had been in psychiatric treatment since at least 2007 for "rage attacks," blackouts, and auditory hallucinations. (Doc. 9-8, p. 35). Mr. Powell reported that he had imaginary friends who he named who kept him "out of trouble." (Doc. 9-8, p. 35). Mr. Powell's mother, who attended the appointment, stated that she stopped Mr. Powell's Adderall after insurance stopped covering it and that he was "no different" without Adderall. (Doc. 9-8, p. 35). Mr. Powell's mother wanted Mr. Powell to "try a job" and reported that Mr. Powell sometimes helped his grandfather in construction. (Doc. 9-8, p. 35).

Dr. McLane indicated that Mr. Powell had appropriate dress and appearance, normal psychomotor activity, appropriate speaking style, appropriate memory, average "intelligence impression," fair judgment and insight, normal organization of

thoughts, unremarkable thinking style, appropriate mood and affect, normal thought content, intact capacity for ADLs, no medication side effects, "odd" rapport, and no suicidal ideation.  (Doc. 9-8, p. 36).  Dr. McLane's diagnoses included ODD, mood disorder, ADHD, rule out bipolar, and rule out personality disorder.  (Doc. 9-8, p. 174).  Dr. McLane noted that Mr. Powell's long-term goal was to "get a job and feel better."  (Doc. 9-8, p. 174).  Dr. McLane found barriers to Mr. Powell meeting his goal were poor impulse control, poor social skills, and poor concentration that interfered with his "daily quality of life."  (Doc. 9-8, pp. 174-75).

At Mr. Powell's visits in December 2015 and March and May 2016, Dr. McLane reported findings like those from September 2015, except that Mr. Powell had appropriate rapport with Dr. McLane during the March 2016 visit.  (Doc. 9-8, pp. 39, 41, 47).  By his August 2016 visit, Mr. Powell reported that he was pleased with his medications and that he had gained weight because of inactivity and eating at night.  (Doc. 9-8, p. 49).  Mr. Powell's mental status examination results had not changed, and Dr. McLane noted an appropriate rapport with Mr. Powell.  (Doc. 9-8, p. 50).  Dr. McLane's diagnoses included ADHD and ODD.  (Doc. 9-8, p. 179).  Mr. Powell's long-term goal was to "find a cool job" that did not bore him.  (Doc. 9-8, p. 179). Dr. McLane noted as barriers to Mr. Powell's goals lack of insurance, poor social skills, poor concentration, and poor impulse control.  (Doc. 9-8, p. 179).

Mr. Powell returned to Dr. McLane in November 2016 and reported that he was pleased with his medications, was more active, and was working at a thrift store. (Doc. 9-8, p. 52).  At a March 2017 visit with Dr. McLane, Mr. Powell noted that he did not like his job and wanted a "better quality of life."  (Doc. 9-8, p. 184).  Mr. Powell reported at June, September, and December 2017 visits that he was pleased with his medications, and Dr. McLane made no changes to Mr. Powell's mental status examination results.  (Doc. 9-8, pp. 62-63, 68-69, 71-72).  Mr. Powell indicated at the June 2017 visit that he still was working at the thrift store.  (Doc. 9-8, p. 63).

In March, June, September, and December 2018, Mr. Powell reported that he was pleased with his medications, that his mood and sleep were stable, and that he could not sleep without taking clonidine.  (Doc. 9-8, pp. 77-78, 80-81, 86-87, 92-93).  Dr. McLane consistently observed that Mr. Powell had fair insight and judgment, appropriate rapport, and an otherwise normal mental status.  (Doc. 9-8, pp. 78, 81, 87, 93).  At the September visit, Mr. Powell reported that he was trying to help his uncle and had a part-time job.  (Doc. 9-8, p. 189).

At a visit with Dr. McLane in March 2019, Mr. Powell reported that he was pleased with his medications and that his mood and sleep were stable.  (Doc. 9-8, p. 98).  In July 2019, Dr. McLane discontinued Mr. Powell's prescription for clonidine

and decreased his prescription for Cogentin for his morning dosage.  (Doc. 9-8, pp. 101-02).

In October 2019, Mr. Powell saw a medical provider at Family Health Associates and complained of a headache, cough, and body aches.  (Doc. 9-8, p. 195).[10]  Mr. Powell's mother asked the doctor to prescribe Mr. Powell's psychiatric medications.  (Doc. 9-8, p. 195).  The medical provider included as diagnoses acute sinusitis, schizophrenia, and bipolar disorder.  (Doc. 9-8, p. 196).  The medical provider informed Mr. Powell and his mother that Mr. Powell would need to continue treatment with a psychiatrist for psychiatric medications.  (Doc. 9-8, p. 196).

Mr. Powell saw psychiatric certified registered nurse practitioner Logan Mendheim at Grayson & Associates in October 2019 for an initial evaluation.  (Doc. 9-8, p. 236).[11]  CRNP Mendheim noted that Mr. Powell had received psychiatric treatment at the mental health center but "want[ed] to try to start with something new."  (Doc. 9-8, p. 236).  Mr. Powell's mother reported that he had been "doing well for years on Geodon" and had a stable mood.  (Doc. 9-8, p. 236).  Mr. Powell's

---

[10]  The record for this visit did not indicate the doctor's name, and the doctor's signature on the record is illegible.  (Doc. 9-8, p. 196).

[11]  The record from this visit does not reflect CRNP Mendheim's medical provider title.  The Court found that information in counselor Quachetta Jones's records for a November 19, 2019 visit.  (Doc. 9-8, p. 230).

mother stated that he had some outbursts and got upset "very easily;" that disruptions in his routine would upset and agitate him; and that he had "high levels of social anxiety." (Doc. 9-8, p. 236). Mr. Powell reported that he could not work because he could not "handle adversity or stressful situations." (Doc. 9-8, p. 236).

Mr. Powell's mother reported to CRNP Mendheim that Mr. Powell displayed "many signs [and] symptoms of autism" but indicated that his screening for autism at 13 years old "came back borderline." (Doc. 9-8, p. 236). In the past psychiatric history section, CRNP Mendheim wrote: "Diagnosed Bipolar Schizophrenia when he was 13." (Doc. 9-8, p. 236).[12] CRNP Mendheim indicated that Mr. Powell had stopped taking clonidine one month earlier. (Doc. 9-8, p. 236). CRNP Mendheim observed that Mr. Powell had normal speech, euthymic mood, normal affect, goal directed thinking, and intact memory. (Doc. 9-8, p. 237). CRNP Mendheim's diagnoses included bipolar disorder, in partial remission; social phobia, unspecified; and rule out autistic disorder. (Doc. 9-8, p. 237).[13] CRNP Mendheim continued Mr. Powell on Geodon and Cogentin, referred him to psychotherapy, and recommended autism testing. (Doc. 9-8, p. 237).

---

[12] The Court cannot find a diagnosis of schizophrenia in the administrative record.

[13] CRNP Mendheim used diagnosis codes F31.77 for bipolar disorder, in partial remission; F40.10 for social phobia, unspecified; and F84 for rule out autistic disorder. *See* https://www.icd10data.com/ICD10CM/Codes/ (last visited February 28, 2024).

In November 2019, Mr. Powell saw CRNP Mendheim and reported that Buspar "significantly reduced" his anxiety symptoms.  (Doc. 9-8, p. 234).[14]  Mr. Powell stated that his mood was stable, he was sleeping well, and he did not have auditory or visual hallucinations.  (Doc. 9-8, p. 234).  Mr. Powell reported that he did not have a depressed mood, low energy, low interests, manic symptoms, irritability, anxious feelings, panic attacks, focus problems, or suicidal thoughts.  (Doc. 9-8, p. 234).  Mr. Powell indicated that he "still experience[d] high levels of social anxiety."  (Doc. 9-8, p. 234).  Mr. Powell was cooperative and well-groomed; he had normal speech, euthymic mood, an appropriate and congruent affect, logical thought process, appropriate thought content, intact attention and concentration, intact memory, an average fund of knowledge, and fair insight and judgment.  (Doc. 9-8, p. 235).  CRNP Mendheim maintained Mr. Powell's prior diagnoses.  (Doc. 9-8, p. 235).

Mr. Powell also saw licensed counselor Quachetta Jones at Grayson & Associates in November 2019.  (Doc. 9-8, p. 230).  Mr. Powell stated that he was not employed.  (Doc. 9-8, p. 232).  He reported that he had a history of emotional outbursts, that he was nervous in large crowds, and that he had meltdowns when he could not make decisions.  (Doc. 9-8, p. 230).  Mr. Powell stated that he had no

---

[14] CRNP Mendheim's October 2019 notes do not include a Buspar prescription, but his November 2019 notes do.  (Doc. 9-8, pp. 235, 237).

energy and low self-esteem, felt helpless and hopeless during outbursts, and had intrusive thoughts and worry about being alone and about the world ending. (Doc. 9-8, p. 230). He reported that he socially withdrew, had poor impulse control, had a history of biting and hitting his head, and had difficulty concentrating. (Doc. 9-8, p. 230). Mr. Powell stated that he had limited friend and social support, had "only online friendship[s]," and was "working on meeting new people." (Doc. 9-8, p. 232). Mr. Powell indicated that he used CBD oil for relaxation and anxiety. (Doc. 9-8, p. 231).

During his November 2019 visit with Ms. Jones, Mr. Powell rated his mental state as 9/10, with 1 being "awful" and 10 being "terrific." (Doc. 9-8, p. 233). He rated his worst mental state at 3/10 when he did not take his medication and "was unable to focus and control [his] emotions." (Doc. 9-8, p. 233). Ms. Jones found that Mr. Powell had moderate impairment in his activities of daily living, work performance, and relationships; fair judgment and insight; appropriate behavior; normal speech; coherent thought processes; euthymic mood; and a congruent affect. (Doc. 9-8, pp. 232-33).

In January 2020, Mr. Powell saw Ms. Jones again. (Doc. 9-8, p. 229). Mr. Powell discussed his goal of working at Walmart, his need to set an alarm nightly to take his medications, and his effort to find ways to become more independent. (Doc. 9-8, p. 229). Ms. Jones noted that Mr. Powell's progress was "adequate" and

included generalized anxiety disorder and social phobias as Mr. Powell's diagnoses. (Doc. 9-8, p. 229).[15]  At a February 2020 visit with Ms. Jones, Mr. Powell indicated that his mental health limited his job options.  He stated that he wanted to work at GameStop, but he had trouble counting money quickly if a customer used cash. (Doc. 9-8, p. 229).  Mr. Powell reported progress with his ADHD and stated that he was much calmer and more focused.  (Doc. 9-8, p. 229).  Ms. Jones recommended that Mr. Powell increase his social interaction and described his progress as "excellent."  (Doc. 9-8, p. 229).

Mr. Powell also saw CRNP Mendheim in February 2020.  (Doc. 9-8, p. 227). CRNP Mendheim noted that Mr. Powell's anxiety was controlled, his mood was stable, and he was sleeping well.  (Doc. 9-8, p. 227).  CRNP Mendheim made similar notes during an April 2020 telemedicine visit.  (Doc. 9-8, p. 225).  CRNP Mendheim diagnosed bipolar disorder, Asperger's syndrome, and unspecified social phobia. (Doc. 9-8, p. 226).[16]  During a September 2020 visit, Mr. Powell reported that he had run out of Geodon for a few days but felt better once he resumed the medication.

---

[15]  Ms. Jones used diagnosis codes F40.10 for social phobia, unspecified and F41.4 for generalized anxiety disorder.  *See* https://www.icd10data.com/ICD10CM/Codes/ (last visited February 28, 2024).

[16]  CRNP Mendheim removed diagnosis code F84 for rule out autistic disorder and added diagnosis code F89.5 for Asperger's syndrome.  *See* https://www.icd10data.com/ICD10CM/Codes/ (last visited February 28, 2024).

(Doc. 9-9, p. 5).  He stated that he was doing well and had a stable mood.  (Doc. 9-9, p. 5).

On November 5, 2020, CRNP Mendheim prepared a handwritten letter addressed to:  "To Whom It May Concern."  (Doc. 9-9, p. 28).  In the letter, CRNP Mendheim stated that Mr. Powell was diagnosed with bipolar disorder with schizophrenia and social anxiety disorder.  (Doc. 9-9, p. 28).  CRNP Mendheim indicated that Mr. Powell was compliant with his medications and therapy.  (Doc. 9-9, p. 28).  CRNP Mendheim recommended that Mr. Powell be considered for disability because of the "severe nature of his diagnoses and his past history of being incapable to even work a part time job."  (Doc. 9-9, p. 28).

On January 15, 2021, Mr. Powell left a message for CRNP Mendheim to report that insurance had stopped covering Buspar, and he (Mr. Powell) would need an alternative medication.  (Doc. 9-9, p. 26).  At a January 20, 2021 telemedicine visit with CRNP Mendheim, Mr. Powell's mood was euthymic and stable; Mr. Powell reported good sleep and no depression, mania, or irritability.  (Doc. 9-9, p. 24).  Mr. Powell stated that he had "social anxiety flare ups in social situations." (Doc. 9-9, p. 24).  CRNP Mendheim still prescribed Buspar.  He also prescribed Geodon and Cogentin.  (Doc. 9-9, p. 25).

In June 2021, Mr. Powell had a telemedicine visit with his mother and CRNP Mendheim.  Mr. Powell reported that he was doing well, had a stable mood, and had

well-managed anxiety "other than in specific social situations" like a "loud, crowded environment." (Doc. 9-9, p. 20). Mr. Powell reported no manic symptoms, irritability, focus problems, or suicidal thoughts. (Doc. 9-9, p. 20). Mr. Powell's mother reported that Mr. Powell would "be getting on disability soon." (Doc. 9-9, p. 20). CRNP Mendheim noted that Mr. Powell had a neutral mood, fair insight and judgment, and an otherwise normal mental status examination. (Doc. 9-9, p. 21). Mr. Powell was prescribed Buspar, Geodon, and Cogentin. (Doc. 9-9, p. 21). CRNP Mendheim maintained Mr. Powell's diagnoses of bipolar disorder, Asperger's syndrome, and unspecified social phobia. (Doc. 9-9, p. 21).

### *Dr. Gloria Roque's Consultative Psychiatric Review*

On September 7, 2020, at the request of the Social Security Administration, psychologist Dr. Roque reviewed Mr. Powell's medical records and assessed his mental limitations between March 27, 2009 and January 9, 2018. (Doc. 9-4, pp. 47, 49). Dr. Roque found that Mr. Powell had moderate limitations in the "paragraph B" criteria of understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. (Doc. 9-4, p. 48). Dr. Roque determined that Mr. Powell could understand and remember simple instructions but not detailed ones; could "sustain attention to simple, preferred[,] familiar tasks for two-hour periods in an 8-hour workday" with customary breaks; would benefit from casual supervision and

familiar work routine; should avoid close work with others; could have casual contact with coworkers and limited and non-intensive contact with the public; should avoid rapid changes and multiple demands; would need "supportive, encouraging, and non-confrontational" feedback; could adapt to "infrequent, well-explained changes"; could travel independently to local destinations; and would benefit from "help with planning and decision making." (Doc. 9-4, pp. 51-52).

### Dr. Robert Estock's Consultative Psychiatric Review

On March 5, 2021, at the request of the Social Security Administration, Dr. Robert Estock reviewed Mr. Powell's psychiatric records and assessed his mental limitations. (Doc. 9-4, p. 64). Dr. Estock appears to have copied the substantive language from Dr. Roque's assessment. (*Compare* Doc. 9-4, pp. 47-53, 64-72). Dr. Estock found that Mr. Powell had moderate limitations in the "paragraph B" criteria of understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting and managing oneself. (Doc. 9-4, pp. 64, 66-70).

### Mr. Powell's Academic Records

The record includes Mr. Powell's individualized educational plan for his senior year of high school during the 2014-2015 school year. (Doc. 9-8, p. 13). Mr. Powell was in general curriculum classes with accommodations and was "working on a general education diploma." (Doc. 9-8, p. 13). Mr. Powell's highest scores

were in vocabulary, but he was reading at a 5.8 grade level.  (Doc. 9-8, p. 13).  His math scores were above the district average.  (Doc. 9-8, p. 13).  Mr. Powell understood "the computer very well."  (Doc. 9-8, p. 13).  Mr. Powell's mother indicated that Mr. Powell was doing well in school, socially could do better, had weaknesses in reading and English, and did well on the computer.  (Doc. 9-8, p. 13). His mother had concerns about Mr. Powell "being able to live by himself when he graduate[d]."  (Doc. 9-8, p. 13).

A vocational assessment of Mr. Powell from Easter Seals Rehabilitation Center revealed high scores in "areas of outdoors, business skilled, art skilled[,] and service skilled worker."  (Doc. 9-8, p. 13).  Job recommendations included retail sales clerk, taxidermist, vehicle cleaner, janitor, and firefighter."  (Doc. 9-8, p. 13). Mr. Powell reported interest in video game design; he took vocational classes in business that allowed him to work on computers; and he enjoyed chess and card games.  (Doc. 9-8, p. 13).

Mr. Powell's teachers reported that he was "doing much better socially" and "was not as anxious."  (Doc. 9-8, p. 13).  They also indicated that he had "learned to control his outburst[s] when he [was] upset" and that he knew when he was "feeling overwhelmed to go [see] the counselor or resource teacher."  (Doc. 9-8, p. 13).  His teachers stated that he was slow completing tasks, had trouble completing his work in the time given, had shorter assignments or extended time to complete assignments,

and struggled to stay awake in class because of his medications. (Doc. 9-8, p. 13). Mr. Powell's teachers indicated that his below-average reading skills "interfered with his comprehension at times" and affected "his ability to complete long reading assignments that require[d] answering questions from passages in the text." (Doc. 9-8, p. 13). Mr. Powell's accommodations included oral tests, extended time on tests, reduced amount of writing in assignments, and a quiet place to calm down when upset. (Doc. 9-8, pp. 20, 24).

Mr. Powell's IEP indicated that he was taking business technology classes at the vocational school and was "working with the Vocational Rehabilitation Counselor to transition from high school to college or work." (Doc. 9-8, p. 19). Mr. Powell's goal was to complete a "job resume and mock interviews with [a] job coach and job shadow at least one area of interest with [a] job coach" by the end of his senior year. (Doc. 9-8, p. 19).

### Mr. Powell's Function Report

In July 2020, at the request of the Social Security Administration, with the help of his mother, Mr. Powell completed a function report. (Doc. 9-7, p. 45). Mr. Powell indicated that he lived with his family. (Doc. 9-7, p. 45). He reported that from the time he woke up until he went to bed, he took his medication, ate breakfast, did chores, sometimes swam, played video games, talked to friends, took medications again, and went to bed. (Doc. 9-7, p. 45). Mr. Powell stated that he

cared for his pets, made sandwiches, used the microwave but not the stove because he forgot to turn it off, did dishes, folded clothes, and did yardwork.  (Doc. 9-7, pp. 46-47).  He indicated that while doing these tasks, he would forget what he was doing and get side-tracked.  (Doc. 9-7, p. 47).

Mr. Powell reported that he needed reminders from his mother to bathe and use deodorant.  (Doc. 9-7, p. 47).  Mr. Powell stated that he did not drive because he could not handle it and would have a "nervous breakdown."  (Doc. 9-7, p. 48).  He shopped in stores for games, movies, headphones, and shoes when someone took him.  (Doc. 9-7, p. 48).  Mr. Powell reported that he could not pay bills, count change, or handle a savings or checking account; he had trouble counting and would forget where he put his wallet.  (Doc. 9-7, pp. 48-49).  He stated that he often played video games, swam, and visited his grandfather and uncle.  (Doc. 9-7, p. 49).

Mr. Powell indicated that he sometimes had a problem getting along with people because he would have a breakdown and that he did not like crowds or loud noises.  (Doc. 9-7, p. 50).  He indicated that he had difficulty with his memory, his ability to concentrate and complete tasks, and his comprehension.  (Doc. 9-7, p. 50).  Mr. Powell reported that he did not read well, could follow spoken instructions if explained well, did not handle stress or changes in routine well, and would have a breakdown if someone screamed or yelled at him.  (Doc. 9-7, pp. 50-51).  He

indicated that he feared dying and the world coming to an end.  (Doc. 9-7, p. 51).

Mr. Powell's handwriting throughout the report was poor.

### Mr. Powell's Mother's Third-Party Function Report

Mr. Powell's mother, Alisha Harris, completed a third-party function report on July 20, 2020.  (Doc. 9-7, p. 29).  Ms. Harris's function report mirrored Mr. Powell's report in most respects.  (Doc. 9-7, pp. 29-36, 45-52).  Ms. Harris stated that she had to remind Mr. Powell to take his medication and that she kept up with his medical appointments.  (Doc. 9-7, pp. 31, 33).  Ms. Harris stated that Mr. Powell went to his friend's house every weekend and his grandparents' house all the time. (Doc. 9-7, p. 33).  She reported that Mr. Powell could pay bills and count "a little bit," forgot things, had trouble concentrating, needed reminders for tasks, and could understand spoken instructions if she spoke slowly.  (Doc. 9-7, p. 34).  Ms. Harris stated that Mr. Powell quit his job at America's Thrift Store because "his new boss didn't understand how to handle him."  (Doc. 9-7, p. 35).  Ms. Harris wrote that Mr. Powell was a "good man," but he "just ha[d] so much trouble with emotions it affect[ed] everything" he did.  (Doc. 9-7, p. 36).

### ALJ Hearing

The ALJ held Mr. Powell's administrative hearing on December 1, 2021 via telephone.  (Doc. 9-3, pp. 45, 48).  Mr. Powell testified that he lived in an apartment in his parents' basement but did not remember his address.  (Doc. 9-3, pp. 51-52).

He stated that he was in special education classes in Winston County but did not know whether he received a high school certificate or degree. (Doc. 9-3, p. 51). Mr. Powell indicated that he read at the fifth-grade level, had issues reading, and read out loud to pronounce words correctly. (Doc. 9-3, p. 57). Mr. Powell testified that he had a driver's permit but not a license, and he did not know if he wanted to take the driver's test because driving made him nervous. (Doc. 9-3, p. 52). He stated that he did not think he would have a problem driving if he could remember where he was going. (Doc. 9-3, p. 52). Mr. Powell indicated that he drove when people needed help if someone was supervising him. (Doc. 9-3, p. 61).

Mr. Powell testified that he had never worked an eight-hour shift. (Doc. 9-3, p. 56). When he worked at the thrift store, he helped customers with heavy items but was stressed when he had to help customers by himself. (Doc. 9-3, p. 53). Mr. Powell described an incident when an item someone bought fell over, and Mr. Powell "was literally in the fetal position," and he tried "so hard not to just cry out, fly out . . . ." (Doc. 9-3, p. 53). He stated that when he felt stress at work trying to get "stuff done," he needed a "minute to collect himself, but he was not given "the time to do it." (Doc. 9-3, p. 53). Mr. Powell testified that he could not work the morning shift because he could not wake up early in the morning, so he switched to "mid to night shift." (Doc. 9-3, p. 53). Mr. Powell stated that his boss asked him for advice on how to help him "work better," but Mr. Powell felt like his boss

"completely ignored" his advice. (Doc. 9-3, pp. 53-43). Mr. Powell testified that he "just gave up and just quit." (Doc. 9-3, p. 54). Mr. Powell did not try to find another job. (Doc. 9-3, p. 56). He stated that he felt like he could not work for eight hours a day for 40 hours a week. (Doc. 9-3, p. 56).

Mr. Powell testified that he did not have blackouts at work because he "tried really hard" to not have that problem there. (Doc. 9-3, p. 54). He stated that he did not have blackouts at home "as often anymore." (Doc. 9-3, p. 54). Mr. Powell indicated that he did not have a problem getting along with people at work, but he had difficulty understanding what people needed him to do because he was easily confused. (Doc. 9-3, p. 56). He stated he had trouble with criticism at work. (Doc. 9-3, p. 57).

Mr. Powell testified that he was hospitalized at Hillcrest in 2015 because he had "too much stress." (Doc. 9-3, pp. 51-52).[17] He testified that he thought he had been diagnosed with autism and that his brother had similar problems. (Doc. 9-3, pp. 55-56). Mr. Powell testified that he still had problems with "cry-outs," (Doc. 9-3, p. 55), but he slept better, (Doc. 9-3, p. 52). Mr. Powell indicated that he did not have attention problems caused by his ADHD "as much anymore." (Doc. 9-3, p.

---

[17] The administrative record shows that Mr. Powell's admission to Hillcrest was in 2012, not 2015. (*See* Doc. 9-8, p. 5).

56).  He did not know what medications he took and stated that his mother made sure he took his medications.  (Doc. 9-3, p. 56).

Regarding social activities and hobbies, Mr. Powell stated that he did not see friends on a regular basis.  (Doc. 9-3, p. 55).  He indicated that he stayed in his apartment most of the time and cleaned the apartment when needed.  (Doc. 9-3, p. 55).  He testified that he liked to play video games like Street Fighter, Smash, Pokémon, and Call of Duty for three or four hours a day if he got "lost into it."  (Doc. 9-3, pp. 55, 58).  He stated that his parents paid him to help around the house to afford video games.  (Doc. 9-3, p. 60).  Mr. Powell indicated that he liked to play Dungeons and Dragons, card games like Magic: the Gathering and Yu-Gi-Oh!, and board games, and he liked to watch television.  (Doc. 9-3, pp. 55, 58-60).  Mr. Powell testified that he went to the comic bookstore at least once a week to "try to meet people" and see if they were interested in playing Dungeons and Dragons with him.  (Doc. 9-3, p. 59).  He stated that he sometimes played games on Discord with his online friends.  (Doc. 9-3, p. 59).  Mr. Powell stated that he did not have a problem interacting with people on social media forums.  (Doc. 9-3, p. 60).  He testified that he felt a "bit uncomfortable" when he met "a lot of new people" in person "in a big crowd."  (Doc. 9-3, p. 60).  Mr. Powell indicated that he had not been to a gaming convention mainly because of COVID-19.  (Doc. 9-3, p. 61).

Mr. Powell's grandfather, Hobson Lamar Powell, Jr., testified that Mr. Powell worked for him two or three days a week in 2017 doing handyman work.[18]  Mr. Powell helped Hobson with "leg work and arm work" and worked as a gopher, getting Hobson's tools for him.  (Doc. 9-3, pp. 63-65).  Hobson stated that the arrangement did not work because Mr. Powell would "go to pieces" and "fall apart kind of" if he had to make decisions.  (Doc. 9-3, p. 63).  Hobson testified that Mr. Powell had a "meltdown" when Hobson corrected Mr. Powell for making a mistake, and Mr. Powell would have to sit in the truck until Hobson completed the job.  (Doc. 9-3, p. 64).  Hobson stated that Mr. Powell needed "one-on-one supervision" and that Mr. Powell could not perform a task "without [someone] standing over him." (Doc. 9-3, p. 64).  Hobson indicated that Mr. Powell could not wake up in the morning to go to work and would sleep on the job because of his medications.  (Doc. 9-3, p. 66).  Hobson stated that Mr. Powell could not work because of his "mental capacity" and lack of focus.  (Doc. 9-3, p. 65).

Mr. Powell's mother, Ms. Harris, testified that Mr. Powell was in special education classes, graduated from high school with a degree, and scored a 13 on his ACT.  (Doc. 9-3, pp. 66-67).  Ms. Harris testified that she shopped for Mr. Powell and had to remind him to take his medications and bathe.  (Doc. 9-3, p. 68).  She stated that Mr. Powell could do these things on his own, but he forgot to do them;

---

[18]  To avoid confusion, the Court will refer to Mr. Powell's grandfather by his first name.

he sometimes took his medications twice.  (Doc. 9-3, p. 68).  Ms. Harris testified that it was unsafe for Mr. Powell to drive because he could not find his way home.  (Doc. 9-3, p. 68).  Ms. Harris stated that Mr. Powell did chores around the house, took out the garbage, and washed dishes, but she had to "stay on him" to do these tasks.  (Doc. 9-3, p. 69).

Ms. Harris testified that Mr. Powell had rage blackouts "every now and then." (Doc. 9-3, p. 69).  She stated that if someone got in Mr. Powell's face or personal space, yelled at him, or kept on him to do something, Mr. Powell lost his temper.  (Doc. 9-3, p. 70).  Ms. Harris testified that changes in routine caused Mr. Powell to "flip[] out."  (Doc. 9-3, p. 71).  Ms. Harris stated that Mr. Powell had a history of biting and hitting his head and sometimes did so when he had a rage blackout.  (Doc. 9-3, p. 72).

Ms. Harris confirmed that Mr. Powell had not worked a 40-hour workweek.  (Doc. 9-3, p. 73).  She stated that Mr. Powell could not work "unless someone [was] constantly on him" and could be "right there with him 24/7."  (Doc. 9-3, p. 73).  Ms. Harris stated that Mr. Powell wanted to try to work when his childhood disability benefits expired, but he had not held a job that required him to work an 8-hour day.  (Doc. 9-3, p. 73).

Ms. Donna Mancini, a vocational expert, testified that Mr. Powell did not have past relevant work.  (Doc. 9-3, p. 74).  The ALJ asked Ms. Mancini to consider the

work available to an individual with the same age, education, and work experience as Mr. Powell who could perform work at any exertional level with the following non-exertional limitations:

> [could] understand, remember, and carry out simple instructions with occasional interaction with coworkers, supervisors, and the public[;] [could] adapt to infrequent changes such that the duties of the job can be learned and mastered within a 30-day period . . . [and could] sustain those tasks for two-hour periods . . . [a]nd if afforded mid-morning, lunch, and mid-afternoon breaks [could] sustain those tasks over an eight-hour day.

(Doc. 9-3, p. 75). Ms. Mancini testified that the hypothetical individual could perform light, unskilled work as a paper-pattern folder with 6,354 available jobs nationally and as a silver wrapper with 8,820 available jobs nationally. (Doc. 9-3, p. 75). Ms. Mancini testified that individual also could perform medium, unskilled work as a cleaner 2 with 51,466 available jobs nationally and as a bacon skin lifter with 4,604 available jobs nationally.

The ALJ next asked Ms. Mancini to assume the limitations in the first hypothetical and add that the individual would need close supervision defined as "the work need[ed] to be reviewed or checked on once an hour." (Doc. 9-3, p. 76). Ms. Mancini testified that limitation would preclude all full-time employment because "no employer would have the ability to provide that much direction." (Doc. 9-3, p. 76).

Ms. Mancini testified that employers generally tolerated "10, no more than 15%" off-task behavior in an eight-hour workday and no more than two absences in a 30-day period.  (Doc. 9-3, p. 76).

## THE ALJ'S DECISION

Following the hearing, the ALJ issued an unfavorable decision.  (Doc. 9-3, p. 11).  The ALJ indicated that his decision covered two periods of time:  the period before Mr. Powell attained age 22 for his adult child's insurance claim and the "time period from the amended alleged onset date, January 2, 2019 through his date last insured on June 30, 2020" for his adult disability claim under title II.  (Doc. 9-3, p. 14).  The ALJ found that Mr. Powell had not engaged in substantial gainful activity "during any of the periods under review."  (Doc. 9-3, p. 14).  The ALJ determined that during both time periods, Mr. Powell suffered from the severe impairments of Asperger's syndrome, ODD, ADHD, mood disorder, social anxiety disorder, and bipolar disorder.  (Doc. 9-3, p. 14).

Based on a review of the medical evidence, the ALJ concluded that before attaining age 22 and through his date last insured, Mr. Powell did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Doc. 9-3, p. 14).  The ALJ evaluated Mr. Powell limitations in the "paragraph B

criteria" for mental impairments and found that Mr. Powell demonstrated moderate limitation in the functional areas.  (Doc. 9-3, pp. 14-15).

Considering Mr. Powell's impairments, the ALJ evaluated Mr. Powell's residual functional capacity.  The ALJ determined that for both time periods under review, Mr. Powell had the RFC to perform:

> a full range of work at all exertional levels but with the following non-exertional limitations:  he could understand, remember, and carry out simple instructions; he could have occasional interaction with co-workers, supervisors, and the public; he could adapt to infrequent changes in the work setting such that the duties of the job could be learned and mastered within a 30-day period; he could sustain these mental tasks for two-hour periods; and, if afforded midmorning, lunch, and midafternoon breaks, he could sustain these tasks over an eight-hour day.

(Doc. 9-3, p. 16).   Based on this RFC and relying on the vocational expert's testimony, the ALJ concluded that Mr. Powell could work as a paper pattern folder, a silver wrapper, a cleaner 2, and a bacon skin lifter.  (Doc. 9-3, p. 22).  Therefore, the ALJ determined that Mr. Powell had not been under a disability as defined by the Social Security Act, "at any time prior to January 9, 2018, the date he attained age 22, or at any time from January 2, 2019, the alleged onset date, through June 30, 2020, the date last insured."  (Doc. 9-3, p. 22).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court reviews the ALJ's "'factual findings with deference'" and his "'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

*Applying the Five-step Sequential Evaluation Process*

Mr. Powell challenges the ALJ's use of the five-step sequential evaluation process to decide Mr. Powell's adult child's insurance claim and his title II claim for disability insurance.  (Doc. 13, pp. 14-15).  Mr. Powell argues that the ALJ should have used "the more lenient medical improvement standard in deciding [Mr.] Powell's new claims," even though Mr. Powell was not receiving child's disability benefits when he applied for benefits in 2020.  (Doc. 13, p. 15).  The Social Security regulations that govern Mr. Powell's claims do not support his argument.

Mr. Powell acknowledges that "it is too late to reopen [his] child's benefits case now."  (Doc. 13, p. 14).  After an individual successfully applies for Social Security benefits and begins receiving them, the Commissioner periodically evaluates the benefit recipient for medical improvement.  20 C.F.R. §§ 404.1594(a), 416.994.  Medical improvement is a "decrease in the medical severity" of

impairments that were present when the Commissioner last determined that the recipient was disabled or continued to be disabled; "[a] determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with your impairment(s)." *See* 20 C.F.R. §§ 404.1594 (b)(1), 416.994.  After benefits terminate, under SSR 404.1505(a), the former benefits recipient must reapply for benefits.  SSR 404.1505(a) provides:

> We will use this definition of disability if you are applying for a period of disability, or disability insurance benefits as a disabled worker, or child's insurance benefits based on disability before age 22 or, with respect to disability benefits payable for months after December 1990, as a widow, widower, or surviving divorced spouse.

20 C.F.R. § 404.1505(a); *see also* 20 C.F.R. §§ 404.1520(a)(2)-(4), 416.920.  For a new application, an ALJ must follow the five-step sequential process discussed earlier in this decision.

Notably, if Mr. Powell had appealed the Commissioner's termination of his child disability benefits at age 19, because Mr. Powell had reached the age of 18, the Commissioner would have had to redetermine Mr. Powell's eligibility for SSI disability benefits under 20 C.F.R. § 416.987 using the definition of disability to evaluate an adult's initial application.  20 C.F.R. § 416.987 (stating that for "age-18 redeterminations," the Commissioner must evaluate disability using rules for adults who file new applications under § 416.920(c) through (h) and not under § 416.994 for determining whether disability continues based on medical improvement).

Under § 416.987(b), for an age 18-redetermination, the Commissioner applies the five-step evaluation process, omitting the initial step of "determining whether an individual is unemployed." *Douglass v. Comm'r of Soc. Sec.*, 5:16-cv-08126-AKK, 2017 WL 4611542, *3 (N.D. Ala. Oct. 16, 2017) (citing § 416.987(b)).

Mr. Powell's reliance on *Ledford v. Astrue*, 311 Fed. Appx. 746 (6th Cir. 2008), to support his argument is misplaced. Mr. Ledford received disability benefits from 1995 until 2001 when his "benefit payments ceased because [Mr.] Ledford failed to respond to inquiries and requests for documentation of [his] continuing disabled status." *Ledford*, 311 Fed. Appx. at 754-55. Mr. Ledford "chose not to pursue administrative appeals of that determination." *Ledford*, 311 Fed. Appx. at 755. Instead, Mr. Ledford filed a new disability application and argued that the ALJ "erred in refusing to reopen the [C]ommissioner's decision to cease benefit payments." *Ledford*, 311 Fed. Appx. at 755. Though Mr. Ledford conceded that his new administrative proceeding did not challenge the 2001 cessation decision, he argued that he should "nevertheless be allowed to challenge the cessation decision . . . because he never received adequate notice of the administrative intention to discontinue benefits." *Ledford*, 311 Fed. Appx. at 755. Mr. Ledford also argued that upon reopening the prior cessation decision, his "evidentiary burden would be less onerous because the law presumes that a person receiving benefits continues to

be disabled in the absence of contrary medical evidence." *Ledford*, 311 Fed. Appx. at 755. The Court in *Ledford* was not persuaded by Mr. Ledford's arguments.

The Court in *Ledford* "refused to consider [the] new . . . application as a challenge to the cessation determination," and the Court found no due process concerns regarding Mr. Ledford's alleged lack of notice because the issue decided by the ALJ on the new application resolved the same issue if the cessation determination was reopened—whether Mr. Ledford was disabled from the time his disability benefits ceased through September 2002 when he filed his new application. *Ledford*, 311 Fed. Appx. at 756. The Court in *Ledford* also found that even if it could reopen the cessation decision and apply a less onerous standard, Mr. Ledford would not be entitled to relief under that standard because his medical condition had improved. *Ledford*, 311 Fed. Appx. at 756. The Court in *Ledford* found that the ALJ properly applied the five-step sequential process and that substantial evidence supported the ALJ's denial of disability benefits. *Ledford*, 311 Fed. Appx. at 753, 757-58.

As in *Ledford*, Mr. Powell did not appeal the decision to terminate his child benefits and concedes that it is too late for this Court to revisit the Commissioner's decision to terminate the child benefits. (Doc. 13, p. 14). Contrary to Mr. Powell's argument, (Doc. 13, p. 15), as discussed elsewhere in this opinion, Mr. Powell's psychiatric records demonstrate that his mental condition improved after he was

awarded benefits in 2010. Thus, as in *Ledford*, even if the Court could revisit the cessation of benefits determination and apply the more lenient medical improvement standard, the result in Mr. Powell's case would be the same.

Thus, the ALJ properly applied the five-step sequential process to evaluate Mr. Powell's eligibility for title II disability benefits and adult child's insurance benefits after Mr. Powell reached his eighteenth birthday.

*Evaluation of the Pain Standard*

Mr. Powell also argues that substantial evidence does not support the ALJ's pain standard findings. The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223). If an ALJ does not properly apply the three-part standard, reversal is

appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. The Commissioner must accept a claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p states:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.   Concerning the ALJ's burden when discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:

> (i)   [the claimant's] daily activities;

> (ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

> (iii)  [p]recipitating and aggravating factors;

> (iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

> (v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

> (vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of Soc. Sec.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Mr. Powell's mental impairments reasonably could be expected to produce his symptoms but found that his "statements concerning the intensity, persistence[,] and limiting effects" were "not consistent with the objective medical evidence." (Doc. 9-3, p. 17). In applying the pain standard, the ALJ recounted in detail Mr. Powell's psychiatric records, (Doc. 9-3, 18-19); the consultative opinions, (Doc. 9-3, pp. 19-20); Mr. Powell's and Ms. Harris's hearing testimony and function reports, (Doc. 9-3, pp. 16-17, 19-20); and Mr. Powell's grandfather's hearing testimony, (Doc. 9-3, p. 17). The ALJ correctly applied the pain standard, and substantial evidence supports the ALJ's pain standard findings regarding Mr. Powell's mental limitations.

The ALJ found that, during the periods under review, Mr. Powell's allegations of disabling mental limitations were inconsistent with medical providers' objective mental status examination findings that Mr. Powell consistently had a normal mood, affect, thought processes and content, attention, concentration, memory, and fund of knowledge. (Doc. 9-3, p. 18) (citing Doc. 9-8, pp. 225-237; Doc. 9-9, pp. 5-26). The ALJ cited Dr. McLane's treatment notes that indicate that Mr. Powell was pleased with his medications and had fair insight and judgment, normal "psychometer activity," average mental intelligence, normal thought processes, and

the capacity to do activities of daily living. (Doc. 9-3, p. 18) (citing Doc. 9-8, pp. 95-104, 174-193). The ALJ noted Mr. Powell's reports in October and November 2019 and in April and September 2020 that his mood was stable; that he did not have depression, mood swings, or behavioral issues; that his anxiety was controlled; and that he slept well. (Doc. 9-3, p. 18) (citing Doc. 9-8, pp. 225-237; Doc. 9-9, pp. 5-26). The ALJ also pointed to treatment notes from January and June 2021 that showed that Mr. Powell was doing well and that he denied depression, "low energy, low interest, manic symptoms, irritability, anxious feelings, panic attacks, OCD symptoms, focus problems, suicidal/homicidal thoughts, hallucinations, and delusions." (Doc. 9-3, p. 19) (citing Doc. 9-9, pp. 20-26).

The ALJ discussed Mr. Powell's daily activities; noted that Mr. Powell could "take care of his own needs;" and explained that Mr. Powell prepared simple meals, followed instructions from healthcare providers with reminders, and handled personal hygiene with reminders. (Doc. 9-3, p. 17). The ALJ recognized that Mr. Powell did not have a driver's license because of his anxiety and concerns about his memory, but the ALJ noted that mental status examinations consistently showed that Mr. Powell had normal short- and long-term memory and thought processes. (Doc. 9-3, p. 18) (citing Doc. 9-8, pp. 95-104, 174-193). The ALJ stated that Buspar had eased Mr. Powell's anxiety, that Mr. Powell's anxiety was well-controlled with his medications, and that Mr. Powell experienced anxiety mainly "during limited social

situations, such as large crowds." (Doc. 9-3, p. 18) (citing Doc. 9-8, pp. 225-237; Doc. 9-9, pp. 5-26). Substantial evidence supports these findings.[19]

Mr. Powell argues that his need for "constant reminders" and inability to "handle a task right on his own" prevent him from working full-time. (Doc. 13, p. 18). In his opinion, the ALJ noted that Mr. Powell had difficulty understanding "what he needed to do," was easily confused, had difficulty handling criticism, "could not figure things out on his own," had anxiety when he worked, and did not handle stress or changes in routine well. (Doc. 9-3, pp. 16-17). The ALJ acknowledged that Mr. Powell struggled in loud, crowded environments and that Mr. Powell needed reminders to take his medications. (Doc. 9-3, pp. 16-17, 19). The ALJ considered those difficulties in assessing Mr. Powell's RFC, and there is "no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal quotations and citations omitted).

The ALJ acknowledged CRNP Mendheim's statement that Mr. Powell should be considered for disability because of the "severe nature of his diagnoses and his

---

[19] With respect to Mr. Powell's use of Buspar, as noted, in January 2021, Mr. Powell communicated to CRNP Mendheim that insurance had stopped covering the cost of Buspar. (Doc. 9-9, p. 26). Nevertheless, a January 2021 psychiatric record that postdates that communication indicates that CRNP Mendheim still was prescribing Buspar for Mr. Powell. (Doc. 9-9, p. 25). Similarly, Mr. Powell's June 2021 psychiatric record indicates that CRNP Mendheim continued Mr. Powell's Buspar prescription. (Doc. 9-9, p. 21). Thus, insurance coverage issues do not appear to have hampered Mr. Powell's use of Buspar.

past history of being incapable to even work a part time job." (Doc. 9-3, p. 20). The ALJ did not find CRNP Mendheim's statement persuasive because the statement was neither consistent with nor supported by CRNP Mendheim's treatment notes. (Doc. 9-3, p. 20). The ALJ pointed to CRNP Mendheim's treatment records that "consistently showed that during the period under review," Mr. Powell was stable on his medications, consistently denied psychiatric symptoms, and had normal mental status examinations. (Doc. 9-3, p. 20).

The ALJ also observed that the state agency psychological consultants found that Mr. Powell had no more than moderate limitations in the "paragraph B criteria" and that both concluded that Mr. Powell could perform simple work with some social limitations and infrequent changes. (Doc. 9-3, pp. 19-20). The ALJ stated that these findings were consistent with and supported by the medical evidence, and the ALJ found the opinions persuasive. (Doc. 9-3, p. 20). Substantial evidence supports these findings. In November 2019, Ms. Jones, Mr. Powell's counselor at Grayson & Associates, determined that Mr. Powell had moderate impairments in his activities of daily living, ability to work, and relationships. (Doc. 9-8, p. 232). In February 2020, Ms. Jones found that Mr. Powell had made excellent progress. (Doc. 9-8, p. 229).

In assessing Mr. Powell's RFC, the ALJ accounted for Mr. Powell's mental impairments. The ALJ explained that he "reduced significantly" the job pressures

and stress for Mr. Powell "by limiting him to simple work with limited social interaction, judgment, and decision-making." (Doc. 9-3, p. 21). The ALJ also limited Mr. Powell to infrequent work-place changes to reduce "work-related stress." (Doc. 9-3, p. 21). The ALJ reasoned that Mr. Powell played video games about four hours a day and could concentrate and understand the games. (Doc. 9-3, p. 21. The ALJ found that Mr. Powell "should be capable of sustaining sufficient attention and concentration for at least two hours at one time with normal breaks during the day." (Doc. 9-3, p. 21).

The ALJ stated specific reasons, supported by substantial evidence in the record, for his decision to partially discredit Mr. Powell's subjective complaints regarding his mental impairment limitations. Because the ALJ properly applied the Eleventh Circuit standard, and substantial evidence supports the ALJ's analysis under this standard, Mr. Powell is not entitled to relief on this issue.

## CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision. The Court will enter a final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this April 12, 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE